IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiff,** | |
| v. | Case No. 15-CR-20074-JAR |
| GREGORY OROZCO, | |
| **Defendant.** | |

**MEMORANDUM AND ORDER
DENYING DEFENDANT'S PRETRIAL MOTIONS**

This case is before the Court on two motions to suppress evidence filed by Defendant Gregory Orozco (Docs. 16 and 17) and his Motion *in Limine* to Exclude DNA Evidence (Doc. 18). In his first suppression motion (Doc. 16), Defendant argues that the evidence from a search of his vehicle on February 23, 2013 should be suppressed because the Deputy U.S. Marshals who conducted the search did not have the authority to do so without a warrant. Defendant's second motion (Doc. 17) argues for suppression of the evidence and statements stemming from the same search of Defendant's vehicle and the custodial interrogation of Defendant. Defendant's Motion *in Limine* (Doc. 18) argues that evidence of DNA tests performed on the firearm retrieved during the February 23, 2013 search should not be allowed at trial because the tests were inconclusive.

The Court held an evidentiary hearing on the suppression motions and heard oral argument on the motion *in limine* on May 16, 2016. Having considered the briefs and the evidence submitted at the hearing, the Court is prepared to rule on Defendant's motions. For the reasons below, the Court denies each of Defendant's motions.

1

**I.     Factual Background**

The Court finds the following facts by a preponderance of the evidence. On February 23, 2013, Deputy U.S. Marshals were seeking a fugitive, Ryan Wayne Barker. The warrant and case were assigned to Deputy U.S. Marshal Brady Flannigan. They had been pursuing Barker for a period of time using confidential sources. Information about Barker had been publicized in a Crime Stoppers report, which included his photograph. The Crime Stoppers report led to anonymous tips about Barker, including a tip telling the Marshals that Barker was staying at a vacant rental property on Metropolitan Avenue in Kansas City, Kansas. Anonymous tipsters also informed the Marshals that Barker was armed with a handgun and possibly a machete, that he was using narcotics, and that he had been making attempts to alter his appearance. A confidential source showed the Marshals a picture on Facebook of Barker in disguise, wearing a wig and colored contact lenses.

The Marshals responded to the house on Metropolitan Avenue as a result of the anonymous tip. The owner of the property gave them permission to search the house, and although no one was there, they found drug paraphernalia and personal items, including male and female clothing, which made them certain someone had been living there. They also found cartridges for a .22 caliber handgun. The Marshals returned to the house later that night to conduct surveillance and noticed that lights were illuminated that had been off when they had searched earlier in the day. The blinds were also open, but had previously been closed. They conducted another search; no one was in the house, but items had been removed since their earlier search.

A neighbor or someone associated with a neighbor to that property (hereafter referred to as CS #2) approached the Marshals and told them that he or she had seen Barker in a silver

Dodge Ram two-door pickup truck.  CS #2 confirmed Barker's cell phone number, which the Marshals had been given by another confidential source.  CS #2 also told the Marshals that they might find Barker at an address near 43rd Street and Georgia Avenue in Kansas City, Kansas.  The Marshals conducted surveillance at that address over a period of days and saw the silver Dodge pickup at the house.  They also drove by the 7th Street Casino in Kansas City, Kansas, which they knew Barker liked to visit, to look for the vehicle there.  On February 20, 2013, Deputy Flannigan saw the pickup at the casino and established surveillance on it.  They observed two white males and a female leave the casino and drive away in the silver pickup.  They asked the Kansas City, Kansas Police Department to conduct a traffic stop on the vehicle, but Barker was not in the vehicle.  The occupants confirmed that they lived at the house on 43rd and Georgia and that Barker had been staying with them, but that he no longer was.

That traffic stop caused the Marshals to develop a third confidential source, CS #3.  CS #3 told the Marshals that Barker was staying with a woman named Amber Sosa at her grandparents' house on Cernech Road in Kansas City, Kansas.  CS #3 told the Marshals that Barker and Sosa were currently asleep in the basement there, so the Marshals went to that house around 5:00 in the morning on February 21.  Sosa's grandparents gave the Marshals consent to search the basement for Barker.  Neither Sosa nor Barker was in the house, but the Marshals found drug paraphernalia in the basement.  Later that day, when Sosa returned to her grandparents' house, the Marshals returned and spoke to her.  She informed them that she had been spending time with Barker for the last two or three days, but she did not know where he was at the moment.  She confirmed that he had been at the house with her before the Marshals arrived that morning.

On February 23, 2013, CS #3 contacted the Marshals and informed them that Amy Stimec-Smart, a friend of Barker's, had contacted an associate of CS # 3 to request pain medication for Barker. Deputy Marshals Christopher Wallace and Matt Cahill met with CS #3 to find out more details of the transaction that CS #3 was arranging with Stimec-Smart. CS #3 informed the Marshals that his associate would bring the pain medication to Barker and Stimec-Smart; the meeting would take place in the parking lot of the CVS Pharmacy at 38th Street and State Avenue in Kansas City, Kansas. CS #3 told them that the target vehicle would be a maroon Dodge extended cab pickup truck. The CS's associate was to arrive in the silver Dodge two-door pickup. The Marshals set up surveillance at the CVS and around 9:00 that evening, the CS confirmed that the transaction was going to take place as planned.

Six Deputy Marshals went to the CVS in multiple vehicles and staged themselves in different places in the parking lot. Deputy Flannigan was about 100 yards to the east of the door to CVS. At around 9:30 p.m., a large maroon pickup truck matching the description provided by CS #3 pulled into the parking lot and stopped in front of the door to CVS. A woman got out of the maroon truck and went into CVS. A red sedan pulled into the parking lot and parked next to the maroon truck, and a man got out of that car and into the passenger side of the maroon truck. The woman then came out of CVS and walked past the maroon truck to the silver truck. Deputy Flannigan could see that the woman was handed an object by the driver of the silver truck, and then she walked back to the maroon truck and got in through the passenger side door. He could see that there were three people in the truck at that point, but he could not see any of their features.

The silver truck left the parking lot and the Marshals drove over to the maroon truck with their emergency lights activated, blocking it in. The Marshals then approached the truck on foot

with their guns drawn. As they were approaching, Deputy Flannigan saw the driver bend over and reach towards the floorboard of the truck, which made him concerned for their safety. The Marshals ordered the vehicle's occupants to get out of the truck; they complied, and the Marshals handcuffed them. Deputy Flannigan confirmed that the female occupant was Amy Stimec-Smart. When they were handcuffing the two male occupants of the truck, the deputies realized that neither of them was Barker. At some point, they identified the driver as Defendant, Gregory Orozco, and the male passenger as Tommy Cordell.

Deputy Wallace handcuffed Defendant and asked him whether he knew Barker. Defendant eventually said that he knew him, but did not know where Barker was. After this conversation, the deputies brought Defendant toward the back of the truck and removed the handcuffs. The deputies also removed the handcuffs from Stimec-Smart and Cordell. Deputy Wallace returned to the maroon truck, which still had its doors open. As he approached the open driver's side door, Deputy Wallace could see a handgun on the floor, partially under the driver's seat. Deputy Wallace informed the other Marshals about the gun, determined that it was not loaded, and put it in the locked box in his vehicle. Other deputies retrieved a magazine for the same firearm, an open pink zipper pouch that contained methamphetamine, a large amount of money, and prescription pills on the seat of the maroon truck. They further searched the vehicle and found marijuana and additional prescription pills on the floor under the driver's seat.

None of the truck's occupants were arrested that evening. Defendant, Stimec-Smart, and Cordell were permitted to leave after the Marshals collected the drugs and gun and determined that Barker was not present.

Defendant testified at the suppression hearing. His testimony with regard to the encounter in the CVS parking lot did not differ in large measure from that of Deputy Flannigan

5

or Deputy Wallace. He testified that when Deputy Wallace found the gun on the floor of the truck, he said "Bingo," which Deputy Wallace disputed. He also testified that the truck was not his but actually belonged to a friend named Mark. Defendant stated that he was not aware there were drugs or a firearm in the vehicle, except for a small amount of marijuana that he admitted was his. Any other differences between Defendant's testimony and that of the deputy Marshals were immaterial to the suppression issues at hand. Furthermore, even if Deputy Wallace had said "Bingo" when he saw the firearm, the Court does not find that this would change the analysis below. Finally, the Court does not credit Defendant's claim that he was unaware of the presence of the drugs and firearm in the truck.

## II. Discussion

### a. Authority of the Deputy U.S. Marshals to Conduct the Search

Defendant's first Motion to Suppress Evidence (Doc. 16) argues that the Deputy U.S. Marshals did not have the authority to search his truck without a warrant. Although he acknowledges that U.S. Marshals have authority to investigate fugitive matters and can make arrests for crimes committed in their presence, he contends that there is no exception to the warrant requirement for searches by U.S. Marshals. Once the Marshals confirmed that Barker was not in the maroon truck, Defendant contends, there was no reason for them to search. Defendant and the other occupants told the deputies that they did not know where Barker was, and the deputies could not learn anything more about Barker by searching the truck.

Title 28 U.S.C. § 566(e)(1)(B) gives the U.S. Marshals Service the authority to "investigate such fugitive matters, both within and outside the United States, as directed by the Attorney General." Section 566(d) allows deputies and officials of the U.S. Marshals Service to

> make arrests without warrant for any offense against the United States committed in his or her presence, or for any felony cognizable under the laws of the United

>States if he or she has reasonable grounds to believe that the person to be arrested has committed or is committing such felony.[1]

The Deputy U.S. Marshals in the instant case were investigating a fugitive matter when they encountered Defendant on February 23, 2013, in keeping with their authority under § 566(e)(1)(B). They had reason to believe that Barker would be in the maroon truck with Stimec-Smart based on the information they had gathered from CS #3, who had already provided other reliable information. According to the evidence presented at the suppression hearing, the encounter in the CVS parking lot took place around 9:30 at night in February. It was dark, and although there were lights in the parking lot, the deputies could not see the people in the vehicle well enough to identify them from a distance. They knew Barker was probably wearing a disguise, so even if they could see the occupants' general forms they could not be certain Barker was not in the truck. It was reasonable for them to believe, until they actually identified the occupants of the vehicle, that Barker might be in the truck. They also had reason to believe that Barker would be armed. The Marshals therefore had the authority to approach the truck and initiate an investigative detention of its occupants as part of their authority to investigate fugitive matters.

The Marshals also had authority to seize the contraband and even arrest the truck's occupants, although they did not make any arrests that night, because they had just witnessed what they reasonably believed to be a drug transaction. Under § 566(d), they had the authority to make warrantless arrests for felony offenses committed in their presence. Defendant cites to no authority in support of his contention that the Marshals did not also have the authority to conduct a warrantless search based on probable cause to believe a crime had taken place. In fact, courts have routinely approved warrantless searches by U.S. Marshals that are justified by exceptions to

---

[1] 28 U.S.C. § 566(d).

the warrant requirement applicable to other law enforcement personnel.[2] As explained more fully below, the Marshals had probable cause to believe criminal activity had taken place, and had the authority to seize contraband that was in plain view in the truck. They also had authority to conduct a search of the vehicle based on that probable cause and even arrest the occupants, if they had so chosen. Accordingly, Defendant's first motion to suppress evidence is denied.

### b. Evidence and Statements Resulting from the Search

Defendant's argument in his second motion (Doc. 17) that the evidence should be suppressed as the result of an unlawful search and the fruit of the poisonous tree is also without merit.

After Defendant and his companions were removed from the truck and questioned by the deputies, Deputy Wallace saw the handgun in plain view through the open door. The drugs, magazine, and money were also in plain view on the truck's seat. "It is a well established legal principle that 'under certain circumstances the police may seize evidence in plain view without a warrant.'"[3]

> The 'plain view' doctrine allows a law enforcement officer to seize evidence of a crime, without violating the Fourth Amendment, if '(1) the officer was lawfully in a position from which the object seized was in plain view, (2) the object's incriminating character was immediately apparent (i.e. there was probable cause to believe it was contraband or evidence of a crime), and (3) the officer had a lawful right of access to the object.'[4]

---

[2] *See United States v. Yeary*, 740 F.3d 569, 580 (11th Cir. 2014) (denial of suppression motion affirmed where Marshals conducted protective sweep of home after arresting fugitive and found contraband in plain view); *United States v. Santiago*, 410 F.3d 193, 202 (5th Cir. 2005) (affirming denial of suppression motion where defendant consented to warrantless search of residence by Marshals, who found firearm in plain view); *United States v. Enslin*, 327 F.3d 788, 793 (9th Cir. 2003) (denial of suppression motion affirmed where Marshals in pursuit of a fugitive searched a home with consent of homeowner and instead found defendant in possession of a firearm).

[3] *United States v. Corral*, 970 F.2d 719, 723 (10th Cir. 1992) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971)).

[4] *United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006) (quoting *United States v. Thomas*, 372 F.3d 1173, 1178 (10th Cir. 2004).

The Marshals were lawfully in a position to view the firearm and other contraband on the seat of the truck. They had just observed what they believed to be a drug transaction, also based on the information provided by CS #3. They knew that an associate of the CS was delivering drugs to Amy Stimec-Smart for Barker, and they had reason to believe that Barker and Stimec-Smart would be in the maroon truck. They saw a female arrive in the maroon truck, retrieve something from the driver of the CS's vehicle, and get back into the truck. Based on those observations and the information they had been given by CS #3, the deputies had probable cause to believe that criminal activity was taking place. Under § 566(d), they had the authority to make arrests for felony offenses committed in their presence, and therefore had authority to approach the maroon truck and arrest the occupants. The truck's doors were left open when Defendant and the other passengers were placed in handcuffs, which allowed Deputy Wallace to see the gun on the floor. Other deputies were able to see the drugs and other contraband on the seat through the open door. Thus, the Marshals were lawfully in a position to view the objects in plain view.

The objects' incriminating character was also immediately apparent. Again, the Marshals had just observed a drug transaction. They specifically knew that the CS's associate was delivering prescription pain medication to Stimec-Smart for Barker, so it was readily apparent that the container of prescription pills on the seat was unlawfully in the possession of Defendant or his companions. The open zipper pouch, large amount of cash, and loaded magazine were also on the seat with the prescription pills, which further indicates that the incriminating character of those items was readily apparent to the deputies. Given that a drug transaction had just taken place, the deputies had reason to believe the firearm was evidence of a drug trafficking crime and thus the incriminating nature of the firearm was also readily apparent.

Finally, the deputies had a lawful right of access to the objects. This third factor of the plain view test "is implicated in situations such as when an officer on the street sees an object through the window of a house, or when officers make observations via aerial photography or long-range surveillance."[5] The instant case does not involve such a situation. The Marshals had conducted a lawful investigative detention of Defendant and the other occupants of the truck, and thus had a lawful right of access to the contraband that was in plain view through the open doors of the truck. Therefore, the Court finds that each factor of the plain view test is satisfied and the Marshals lawfully seized the evidence at issue.

Based on the evidence at the suppression hearing, the majority of items seized were in plain view. The marijuana and pills that were found under the driver's seat were seized as a result of the Marshals' probable cause to further search the truck. They had just witnessed a drug transaction and knew that the proceeds of that transaction would likely be in the truck. They had also seen contraband in plain view on the seat and floor of the truck. The Marshals thus lawfully searched the truck and found the additional pills and marijuana under the driver's seat. Accordingly, the Court declines to suppress the evidence seized from the maroon truck.

Defendant also argues that he made statements to the Marshals that should be suppressed because he was in custody and had not been advised of his rights pursuant to *Miranda v. Arizona*.[6] The Government states in its brief that it does not intend to seek introduction of any statements made by Defendant.[7] There was very little evidence at the suppression hearing about Defendant's alleged statements. Deputy Wallace testified that he asked Defendant his name, and

---

[5] *United States v. Naugle*, 997 F.2d 819, 823 (10th Cir. 1993).

[6] 384 U.S. 436 (1966).

[7] Doc. 23 at 17–18.

he asked Defendant whether he knew Barker's whereabouts. Deputy Wallace testified that Defendant first denied knowing Barker, and then admitted knowing him but told the deputy he did not know where Barker was. Defendant testified that he told the Marshals that the marijuana was his, but he did not know about the other items in the truck. Neither deputy testified about those alleged comments. Given that the Government does not intend to introduce any of Defendant's alleged statements, the Court declines to rule on that issue at this time. If the Government's position changes, Defendant may renew his motion to suppress the statements.

For the reasons explained above, the Court denies Defendant's second motion to suppress evidence.

### c. Motion *in Limine* to Exclude DNA Evidence

Defendant moves the Court *in limine* to exclude DNA evidence at trial (Doc. 18). The Kansas Bureau of Investigation conducted DNA tests comparing oral swabs from Defendant to swabs from the grip, slide, and trigger of a Beretta handgun with a serial number of MX02724. The test of the grip of the Beretta indicated a partial mixed DNA profile which was insufficient for comparison. No conclusions could be made from the swab of the grip. The tests of the slide and trigger were also inconclusive. Defendant argues that the evidence of this testing should not be admitted at trial pursuant to Fed. R. Evid. 403 because the risk of unfair prejudice outweighs the probative value of the evidence. He argues that there is a high risk of prejudice because the jury might make inferences that Defendant's DNA is on the gun despite the inconclusive test results.

The Government argues in response that testimony about the inconclusive tests should be introduced to explain to the jury why there is no DNA evidence linking Defendant to the gun. It

contends that the lack of conclusive results goes to the weight of the evidence, not to its admissibility.

Although the Court recognizes that this evidence may not carry great weight, it is relevant and admissible at trial. The fact that the tests were inconclusive cuts both ways, and in fact could be interpreted in favor of Defendant just as it might be interpreted against him. Thus, the risk of unfair prejudice to Defendant is relatively low. Either party may introduce evidence that the DNA testing was attempted but the results were inconclusive. Defendant's Motion *in Limine* is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motions to Suppress Evidence and Statements (Docs. 16 and 17) are denied.

**IT IS FURTHER ORDERED** that Defendant's Motion *in Limine* to Exclude DNA Evidence (Doc. 18) is denied.

**IT IS SO ORDERED.**

Dated: June 28, 2016

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE