## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 15-20074-JAR** |
| **GREGORY OROZCO,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

After a jury trial, Defendant Gregory Orozco was convicted of two counts of drug trafficking charges and acquitted of two counts of firearm charges. This matter comes before the Court on Defendant's Motion for New Trial (Doc. 92); Defendant seeks either a new trial, or an order vacating the convictions and dismissing the charges with prejudice.[1] The Court held two evidentiary hearings on this matter. At the conclusion of the second hearing, the Court invited the parties to submit additional briefing regarding the type of remedy the Court should enter if it found a Sixth Amendment violation. The parties each submitted supplemental briefing.[2] The matter is fully briefed and the Court is now prepared to rule. Based on the evidence, the Court finds that the prosecutor in this case, Assistant United States Attorney ("AUSA") Terra Morehead, substantially interfered with a defense witness's decision to testify. The Court concludes that in doing so, AUSA Morehead violated Defendant's rights under the Sixth Amendment. As more fully explained below, AUSA Morehead's conduct in violating the Sixth Amendment cannot be adequately remedied by a new trial. Thus, the Court grants Defendant's

---

[1] See Defendant's supplemental brief, Doc. 119.

[2] Docs. 119 and 120.

motion, vacates the convictions on Counts 1 and 2, and dismisses Counts 1 and 2 of the Superseding Indictment with prejudice.

## I.      Charges and Pretrial Procedural Background

Defendant was charged in a Superseding Indictment with: Count 1—conspiracy to possess with intent to distribute fifty grams or more of methamphetamine; Count 2—knowingly and intentionally possessing with intent to distribute five grams or more of methamphetamine; Count 3—knowingly, intentionally, and unlawfully possessing a firearm in furtherance of a drug trafficking crime; and Count 4—felon in possession of a firearm.   Counts 2, 3 and 4 stemmed from an interaction between United States Marshals and three occupants of a car, including Defendant.  Only Defendant was charged.

The trial was originally set to commence on December 12, 2016.  On that morning, AUSA Morehead filed an Information to Establish Prior Conviction,[3] effectively doubling the mandatory minimum sentence for the conspiracy charged in Count 1, from a mandatory minimum of 10 years to a mandatory minimum of 20 years.

And, just minutes before the trial was to commence, Defendant moved to continue the trial because AUSA Morehead only that morning had provided him with additional evidence. This evidence was three SIM cards and a flash drive, which had been in the same small case from which officers had recovered the methamphetamine charged in Count 2.   Defendant noted that this evidence consisted of more than 200 photographs that may be associated with one of the other individuals in the car, not Defendant.

AUSA Morehead advised the Court that her late-disclosure of this evidence was inadvertent, as the evidence had been secured in the property vault, rather than in the evidence

---

[3]Doc. 60.

vault, and she only became aware of it shortly before trial.  When the Court asked AUSA Morehead whether she intended to use this evidence, she responded that these were "random, discrete photos" of "normal things" that "didn't appear to be anything related to drugs or guns or anything like that."[4]

AUSA Morehead did not inform the Court that this evidence was potentially exculpatory evidence, that is, Brady information that she was required to disclose.  But, it was Brady evidence, and ultimately figured prominently in the defense.   Based on the late disclosure of this evidence, the Court continued the trial for two months, until February 2017.

## II.      Government's Evidence at Trial

Several Deputy United States Marshals ("DUSMs") were assigned to find a fugitive named Ryan Barker.  The DUSMs learned that Barker would likely arrive at a certain CVS store on the evening of February 23, 2013 in a maroon truck with a woman named Amy Stimec-Smart, and engage in a drug transaction.  Thus, the DUSMs set up surveillance outside the CVS store. They observed a maroon pickup truck arrive with three occupants.  They further observed a silver pickup truck arrive and park close to the maroon truck.  They watched as a woman exited the passenger side of the maroon truck, walked to the silver truck, took an object from the driver of the silver truck, and returned to the maroon truck.

Believing this was the anticipated drug transaction involving Mr. Barker, the DUSMs converged on the maroon truck.  DUSM Brady Flannigan saw the driver of the truck reaching for the floorboard.  The DUSMs yelled their presence and ordered the three occupants, all sitting in the front seat, to exit the truck.  Defendant was in the driver's seat and exited the truck.  Tommy Cordell-Eastland, who was sitting in the middle of the front seat, and Amy Stimec-Smart, who

---

[4]Dec. 12, 2016 Trial Tr., Doc. 63 at 4–5.

was sitting next to the passenger window of the front seat, also exited the truck.  The DUSMs did not find Mr. Barker during this encounter.  After handcuffing the three occupants, the DUSMs searched the truck.

Under the driver seat where Defendant had been sitting, DUSMs recovered an unloaded firearm, which was partially visible from the driver's side floorboard.  They also recovered from under the driver's seat a clear plastic case that contained pills, marijuana and 4 small empty plastic baggies that usually package user-quantities of narcotics.  On the front seat of the truck where the three occupants had been sitting, the DUSMs found a loaded magazine that fit the firearm and a large amount of US currency.  In the flipped-up front seat console armrest, the DUSMs found  a small pink nylon case that contained the aforementioned SIM cards and flash drive, including over 200 photographs of Amy Stimec-Smart and her family and friends.  The small pink nylon case also contained one bag containing 41.3 grams of methamphetamine.[5] Amy Stimec-Smart testified that the small pink case could have belonged to her, but the methamphetamine was not hers.  Neither Amy Stimec-Smart, nor Tommy Cordell Eastland was charged.  Defendant was charged with possession with intent to distribute the methamphetamine, using or carrying the firearm in furtherance of the methamphetamine charge, and being a felon in possession of the firearm.  The jury acquitted Defendant of both firearm charges.

Defendant was also charged, and the jury convicted him of, conspiracy to distribute or possess with intent to more than 50 grams of methamphetamine, from 2012 to June 2013.  The government called several witnesses regarding Defendant's purchase or sale of methamphetamine during the time of the alleged conspiracy.  Tommy Cordell-Eastland, who had been in the truck with Defendant, testified that he had bought personal-use amounts of

---

[5]The parties stipulated that the substance was 41.3 grams of net methamphetamine, tested at 83.9% pure, for an actual weight of 34.8 grams of methamphetamine.  Doc. 86 (Jury Instruction No. 25).

methamphetamine from Defendant, ranging from 1.75 grams to 3.5 grams; over time he began buying larger quantities from Defendant to sell to others, ranging from 1.5 to 2 ounces.  Cordell-Eastland testified that the largest quantity he ever bought from Defendant was ¼ pound; and that he had another supplier as well.  Cordell- Eastland further testified that on the day of the encounter with the DUSMs, he had paid Defendant $1000 he owed him from a prior drug purchase from Defendant; and this money was seized by the DUSMs.  Cordell-Eastland also testified that he and Defendant used methamphetamine together.   Brittany Eastland, who is married to Cordell-Eastland, testified that she had previously been Defendant's live-in girlfriend and that Defendant supplied her with personal-use amounts of methamphetamine which she used, and sometimes sold to others.   On cross-examination, Defendant challenged the quantities and frequencies of these transactions, and also challenged the motivations of these witnesses.

Felix Leal and Jose Alejandro Ruiz ("Alejandro Ruiz") were also called as government witnesses and testified that they sold methamphetamine to Defendant during the time period charged in the Count 1 conspiracy.  Leal testified that he sold methamphetamine to Defendant in one- to two-ounce quantities, once or twice a week, which were for Defendant's personal use.  Sometimes Leal gave methamphetamine to Defendant, in exchange for Defendant allowing Leal to live in Defendant's house while Leal's house was under heavy law enforcement surveillance.[6] Leal testified that Defendant in turn sold methamphetamine to Cordell-Eastland.

While the other witnesses testified that Defendant typically bought or sold one to two ounces of methamphetamine or less, government witness Alejandro Ruiz testified that Defendant bought larger quantities from him.  Alejandro Ruiz testified that he met Defendant in early 2012 at the Seventh Street Casino in Kansas City, Kansas and began selling methamphetamine to him

---

[6]Feb. 9, 2017 Trial Tr., Doc. 99 at 68, 94, 105.

after that time.[7]  Alejandro Ruiz testified that he began selling to Defendant in one- to two-ounce quantities, but progressed to selling him four-ounce quantities when Defendant "was doing good."[8]  He further testified that he dealt methamphetamine to Defendant until November or December 2012, and that during this time he sold Defendant four-ounce quantities of methamphetamine more than five times.[9]  He testified that he dealt methamphetamine to Defendant up to two or three times a week during this time.[10]  Alejandro Ruiz also testified that he sold a chameleon-colored Camaro to Defendant in August 2012, and that he did not recall that Defendant ever paid him for the car.

On cross-examination, Defendant's attorney, James Campbell, challenged Alejandro Ruiz's motivation to testify, questioned why he did not mention Defendant's name in his proffer to case agents, questioned whether he had ever sold methamphetamine to Defendant and questioned whether he had been introduced to Defendant by his brother, Jose Luis Ruiz-Salazar.[11]  Defendant's counsel also questioned whether Alejandro Ruiz sold the chameleon-colored Camaro to Defendant, or whether it was actually his brother, Jose Luis Ruiz-Salazar who sold the Camaro.  Alejandro Ruiz denied that his brother introduced him to Defendant, and stated that he, not Ruiz-Salazar, sold the Camaro to Defendant.[12]

## III.  Defense Witnesses

Near the end of the Government's case, the Court conducted a hearing, out of the jury's presence, about Defendant's witnesses.  Defendant appeared by his counsel, James Campbell.

---

[7]Feb. 8, 2017 Trial Tr., Doc. 98 at 92.

[8]*Id.* at 87–92.

[9]*Id.* at 92.

[10]*Id.* at 114.

[11]*Id.* at 122–36.

[12]*Id.* at 136.

AUSA Morehead appeared.  Jose Luis Ruiz-Salazar's attorney of record, Tracy Spradlin, also appeared.

Mr. Campbell advised the Court that Defendant intended to call two witnesses, Clayton Deardorff and Jose Luis Ruiz-Salazar, but that Deardorff would be exercising his Fifth Amendment right not to testify, such that Defendant would not call him to testify.

Mr. Campbell further advised that he understood Ruiz-Salazar would testify regarding the following two matters: (1) that he, not Alejandro Ruiz, sold the Camaro to Defendant; and (2) that while he was friends with Defendant, his brother Alejandro Ruiz did not have a friendship or relationship with Defendant.[13]  AUSA Morehead stated that she understood Mr. Campbell was bringing this issue to the Court's attention because if Ruiz-Salazar testified, she would be able to cross-examine and impeach him.  AUSA Morehead further explained:

> [Ruiz-Salazar] is indicted on a federal drug case in the Western District of Missouri.  And once he subjects himself to questioning, he's then subjected to impeachment.  And the—I think one reason I wanted to bring it up is to make sure that there had been full conversation with him about the consequences of this, that he would be subject to cross examination.  And if—if it's obviously determined that he's not being truthful, that there could be consequences, you know, beyond that, not only in this case but in the case there.  Because if he were to perjure himself here, that could have consequences in his pending case there.[14]

The Court then ruled that AUSA Morehead was permitted to ask Ruiz-Salazar if he was facing pending charges in the Western District of Missouri and whether he was seeking favorable treatment in that case by testifying in this case, but AUSA Morehead was not permitted to ask Ruiz-Salazar about the underlying circumstances of those charges because that would tread on Ruiz-Salazar's Fifth Amendment rights.[15]  Tracy Spradlin, Ruiz-Salazar's attorney, stated that she believed he was willing to testify under these limitations.  Ms. Spradlin requested that the

---

[13] Feb. 9, 2017 Trial Tr., Doc. 111 at 133.

[14] *Id.* at 134.

[15] *Id.* at 135–37.

Court explain to Ruiz-Salazar that he "did have the Fifth Amendment right, that he might face a perjury charge," and that if he wanted to invoke his Fifth Amendment right during testimony he should say "I need to speak to my attorney."[16]  The Court ten brought Ruiz-Salazar into the courtroom and engaged in the following colloquy:

> THE COURT: . . . We've had a discussion here before you came into the courtroom about the fact that you have a pending federal drug case over in Kansas City, Missouri.
>
> MR. RUIZ: Yes, ma'am.
>
> THE COURT: And that you have a right not to incriminate yourself about those charges under the Fifth Amendment of the United States Constitution, something that Ms. Spradlin has advised you about; is that correct?
>
> MR. RUIZ: Correct.
>
> THE COURT: All right.  So I have told the government that they can ask you, one, whether you have a pending case and, two whether you're seeking some sort of favorable treatment in that case by testifying here.  They can ask you that.  But that they are not allowed to—and that would include the defendant, not allowed to ask you about the circumstances or the facts underlying your charges.  So they can't ask you about anything to do with the—you know, the charges themselves and—and what you're charged with, what the allegations are, what your role was, what—what your defense is.  I mean, anything like that, because that would be on Fifth Amendment protected ground.  Your lawyer has represented that you would claim the Fifth Amendment.  Now, I don't want you to claim the Fifth Amendment in front of the jury when you're testifying.  So if there's a question that gets into the facts and circumstances of your case or that—some question that you think if you answer it, it might incriminate you, what you need to do at that point is say, "May I stop and talk to my lawyer?"
>
> MR. RUIZ: Okay.
>
> THE COURT: Then we'll take a break and then you can talk to Ms. Spradlin.  But just know at the outset, I've already told the government and—and the defense they are not allowed to ask you any questions about the facts and circumstances underlying your charges.  They can ask you whether you have pending charges, pending drug conspiracy charges.  They can ask you that.  But they can't go any further than that, other than to say, are you—you know, perhaps are you hoping to

---

[16]*Id.* at 138.

get some favorable treatment in your case by testifying here.  They can ask you that much.

MR. RUIZ:  All right.

THE COURT: Do you understand?

MR. RUIZ: I understand. [17]

After Ruiz-Salazar left the courtroom, AUSA Morehead stated that Ms. Spradlin had previously indicated that she would allow AUSA Morehead the opportunity to interview Ruiz-Salazar before he testified.  AUSA Morehead thus asked the Court for permission to speak with Ruiz-Salazar, while acknowledging "knowing the parameters of what the Court has indicated."[18] The Court approved and explained that AUSA Morehead could speak with Ruiz-Salazar and his counsel during an upcoming recess.

Following the recess, Mr. Campbell reported that Ruiz-Salazar was no longer willing to testify.  Mr. Campbell indicated that he believed Ruiz-Salazar had changed his mind based on discussions with AUSA Morehead.[19]  AUSA Morehead stated that she had talked only to Ms. Spradlin, rather than to Ruiz-Salazar himself.[20]  Additionally, AUSA Morehead stated that she simply "discussed the fact that if he was found to be lying under oath that there could be perjury consequences.  And that was the extent of any consequence that I'm aware of that he could face."[21]

Ms. Spradlin confirmed that Ruiz-Salazar would not be testifying, because "he's feeling a little uneasy.  And I think that in relation to some of the stuff going on with his current case, he's

---

[17]*Id.* at 141–43.

[18]*Id.* at 144.

[19]*Id.* at 188–89.

[20]*Id.* at 188.

[21]*Id.* at 189.

decided that he would rather not."[22]  Mr. Campbell asserted that he believed "Mr. Ruiz' position changed when he was advised through counsel after talking to the government that his testimony may well have an influence on his case in the Western District."[23]

On the morning of February 10, out of the jury's hearing, Defendant informed the Court that he decided to testify in his own defense now that Ruiz-Salazar and Deardorff had decided not to testify.  Defendant stated that these witnesses decided not to testify because the Government had pressured them to not testify.  Defendant stated that while he and Ruiz-Salazar were being transported back to the Corrections Corporation of America ("CCA")[24] Leavenworth Detention Center on February 9, Ruiz-Salazar told him that after the aforementioned hearing in which the Court had given AUSA Morehead permission to interview him, Morehead had said to Ruiz-Salazar's attorney, if "he gets in my way, I'm going to get in his way."[25]  Ruiz-Salazar further told Defendant that after AUSA Morehead's comments, Ms. Spradlin told Ruiz-Salazar "let's step away from this case."[26]

Defendant further advised the Court that "I feel I have to [testify] since my witnesses aren't going there to testify for me.  I have to get on the stand.  I don't want to, but without Ruiz and them, I can't prove my innocence."[27]  Defendant proceeded to testify.  He was convicted on the Count 1 conspiracy charge and Count 2 possession with intent to distribute charge, and acquitted on the two firearm charges.

---

[22]*Id.*

[23]*Id.*

[24]CCA is now known as "CoreCivic."

[25]Feb. 10, 2017 Trial Tr., Doc. 87 at 9.

[26]*Id.*

[27]*Id.* at 11.

**IV.    Evidentiary Hearing on Post-trial Motion**

Following trial, Defendant timely filed the instant motion, in which he argued that the Government had interfered with his Sixth Amendment right to a fair trial based on AUSA Morehead's statement to Ms. Spradlin, and Ruiz-Salazar's resulting decision to not testify.  The Court held a hearing on Defendant's motion on May 26, 2017, at which time the Court heard testimony from Defendant and Ms. Spradlin.  Defendant testified about the statement Ruiz-Salazar made to him in the van on the way back to CCA.  Ruiz-Salazar told him that AUSA Morehead said that if he got in her way, she would get in his way, and that Ms. Spradlin told him to "get away from this case, so he felt threatened and decided not to testify on my behalf."[28]

Ms. Spradlin submitted an affidavit concerning her conversation with AUSA Morehead, in which she stated AUSA Morehead advised her (1) that Ruiz-Salazar could be charged with perjury should he testify, and (2) that she was aware of Ruiz-Salazar's indictment and which Western District of Missouri AUSA was handling that indictment.[29]  Ms. Spradlin's affidavit further stated that she could not recall all the specifics of her conversation with AUSA Morehead in enough detail to state anything further.[30]  At the May 26, 2017 hearing, Ms. Spradlin also testified about their conversation.  Ms. Spradlin testified that in a five-minute conversation, AUSA Morehead advised her that Ruiz-Salazar could be charged with perjury should he testify. Ms. Spradlin testified that AUSA Morehead's tone "was assertive, [but] I don't think I would say confrontational."[31]  Ms. Spradlin further testified that AUSA Morehead explained to her that seeking ramifications against her client if he testified "was a strong possible outcome."[32]  Ms.

---

[28]May 26, 2017 Hrg. Tr., Doc. 112 at 8.

[29]Def. Ex. 300.

[30]*Id.*

[31]May 26, 2017 Hrg. Tr., Doc. 112 at 22.

[32]*Id.*

11

Spradlin testified that she learned that her client did not intend to testify after she spoke to him after her conversation with AUSA Morehead on February 9, 2017.

Mr. Campbell explained that Defendant also wished to have Ruiz-Salazar testify at the May 26, 2017 hearing, but that Ms. Spradlin indicated that Ruiz-Salazar intended to exercise his Fifth Amendment rights and did not wish to testify. The Court explained that it would have to make a determination as to whether Ruiz-Salazar could invoke his Fifth Amendment rights, and determine the scope of any questions from defense counsel. Thus, the Court explained that it would conduct another hearing to make those determinations. Defense counsel proposed submitting questions to Ms. Spradlin and the Government, and suggested that they could object to those questions if necessary, and that the Court could resolve any issues regarding the questions that the parties could not resolve themselves. The Court agreed to this procedure and agreed to set the hearing after the conclusion of Mr. Ruiz-Salazar's trial.

The Court conducted this second evidentiary hearing on September 13, 2017, and Ruiz-Salazar testified. Ruiz-Salazar testified that he and Defendant began discussing Defendant's case and how it was going during the ride in the van back to CCA on February 9, 2017. He testified that he volunteered to Defendant the information that AUSA Morehead had said that if he got in the prosecutor's way, she would get in his way in his case.[33] Ruiz-Salazar testified that he had not talked directly with AUSA Morehead, but that he felt threatened that if he testified in Defendant's case, it would impact his own case.[34] He further testified that he did not mention anything about perjury to Defendant, and that he decided not to testify after speaking with his attorney "[b]ecause my attorney and I talked that it wasn't like right at that moment."[35] Ruiz-

---

[33]Sept. 13, 2017 Hrg. Tr., Doc. 118 at 14, 20.

[34]*Id.* at 15.

[35]*Id.* at 15.

Salazar testified that he told Defendant he would be willing to tell the Court what had occurred

and why he changed his mind about testifying.  Finally, Ruiz-Salazar testified that on February 9,

at the time of his colloquy with the Court, he was willing to testify at trial, but that he decided

not to testify when he spoke with his attorney after that hearing.[36]  At the September 13, 2017

hearing, Ms. Spradlin advised the Court that Ruiz-Salazar had entered a plea in his case in the

Western District of Missouri, and that he was awaiting sentencing.

## V.      Discussion

Defendant argues that the Government violated his Sixth Amendment right to present a

defense based on AUSA Morehead's comments to Ruiz-Salazar's counsel and Ruiz-Salazar's

subsequent decision not to testify.  Defendant argues that this violation materially affected his

defense.  He therefore urges the Court to either grant him a new trial, or to dismiss both counts of

conviction against him.  The Government does not deny the incidence nor content of the

comments that AUSA Morehead made to Ms. Spradlin on February 9.  The Government merely

argues that it did not violate Defendant's Sixth Amendment rights.  The Government further

argues that the testimony of Ruiz-Salazar was not material to the defense, and that neither a new

trial nor dismissal, would be appropriate remedies.  The Court first addresses AUSA Morehead's

violation of Defendant's Sixth Amendment right to prepare a defense.  The Court then addresses

the appropriate remedy.

### A.      Sixth Amendment Violation

"The Fifth (or Fourteenth if a state is involved) and Sixth Amendments concomitantly

provide a criminal defendant the right to present a defense by compelling the attendance, and

---

[36]*Id.* at 20.

presenting the testimony, of his own witnesses."[37]  The right derives from the Sixth Amendment

Compulsory Process Clause, and the Fifth and Fourteenth Amendment Due Process Clauses.[38]

This right, however, is not absolute, and several Circuits have held that it does not include the

right to compel a witness to waive his Fifth Amendment privilege against self-incrimination.[39]

   But this right may be infringed if the prosecution substantially interferes with a defense

witness's decision to testify.[40]  In *Webb v. Texas*, the Supreme Court held a trial judge's "lengthy

and intimidating warning" and "threatening remarks" effectively caused the defendant's only

witness not to testify in violation of the Due Process Clause.[41]  "Therefore, a judge's admonition

to a witness can violate *Webb* if it is threatening and employs coercive language."[42]  Courts have

applied *Webb* to prosecutors.[43]  Conduct that interferes substantially with a defense witness's

decision to testify may take the form of threats of perjury, use of coercive or intimidating

language, threats of prosecution, or other intimidating conduct.[44]

   The Tenth Circuit has explained the due process analysis under *Webb* as follows:

> The dispositive question in each case is whether the government actor's
> interference with a witness's decision to testify was "substantial."  Interference is
> substantial when the government actor actively discourages a witness from
> testifying through threats of prosecution, intimidation, or coercive badgering.  The
> potential for unconstitutional coercion by a *government actor* significantly
> diminishes, however, if a defendant's witness elects not to testify after consulting
> an independent attorney.[45]

---

[37]*United States v. Serrano*, 406 F.3d 1208, 1215 (10th Cir. 2005) (citing *Washington v. Texas*, 388 U.S. 14, 18–19 (1967)).

[38]*Id.*

[39]*Id.*

[40]*Webb v. Texas*, 409 U.S. 95, 97–98 (1972) (per curiam); *Serrano*, 406 F.3d at 1215.

[41]*Webb*, 409 U.S. at 97–98.

[42]*Serrano*, 406 F.3d at 1215 (citing *United States v. Smith*, 997 F.2d 674, 680 (1993)).

[43]*Id.* (citing *United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983)).

[44]*Id.* at 1216; *Davis v. Roberts*, 579 F. App'x 662, 670 (10th Cir. 2014); *United States v. Martinez*, No. 16-10062-JTM, 2016 WL 4399185, at *1 (D. Kan. Aug. 18, 2016).

[45]*Serrano*, 406 F.3d at 1216 (emphasis in original).

Courts should consider the following factors in determining whether the government actor's interference with a witness's decision to testify was "substantial": (1) whether the witness consulted with an independent lawyer before refusing to testify; (2) the degree and kind of warning made to the witness; and (3) whether the evidence shows the prosecutor acted in bad faith.[46]  While merely warning a witness of the consequences of perjury is insufficient to constitute a Sixth Amendment violation, "[u]nnecessarily strong admonitions against perjury aimed at discouraging defense witnesses from testifying have been held to deprive a criminal defendant of his [constitutional rights]."[47]  Furthermore, "a defendant is denied due process of law when a trial judge, *without any basis in the record to conclude that a witness may lie, sua sponte* admonishes the defendant's only witness . . . and thereby discourages the witness from testifying."[48]

In *United States v. Allen*, the Tenth Circuit explained that a defendant claiming a violation of the right must also "provide evidence that there was actual government misconduct in threatening or intimidating potential witnesses and that such witnesses otherwise would have given testimony both favorable to the defense and material."[49]

In light of the above authority, the Court finds that the Government violated Defendant's Sixth Amendment right to present a defense.  To be sure, AUSA Morehead's conversation with Ms. Spradlin was five minutes or less in duration.  AUSA Morehead did not speak directly to Ruiz-Salazar.  And, Ruiz-Salazar spoke with his attorney, Ms. Spradlin, before deciding not to

---

[46]*Martinez*, 2016 WL 4399185, at *2 (quoting *United States v. Clark*, 284 F. App'x 555, 557 (10th Cir. 2008)).

[47]*United States v. Juan*, 704 F.3d 1137, 1141 (9th Cir. 2013) (quoting *United States v. Vavages*, 151 F.3d 1185, 1192 (9th Cir. 1998)).

[48]*United States v. Smith*, 997 F.2d 674, 680 (10th Cir. 1993) (quoting *United States v. Simmons*, 670 F.2d 365, 368–69 (D.C. Cir. 1982)) (emphasis in original).

[49]603 F.3d 1202, 1211 (10th Cir. 2011).

testify.  These facts weigh against a finding that the Government "substantially interfered" with Defendant's witnesses.

But, several factors weigh strongly in favor of a finding of substantial interference with Defendant's right to present a defense.  First, the "degree and kind of warning" made to Mr. Ruiz-Salazar, through his counsel, was substantial.[50]  While Ms. Spradlin testified that AUSA Morehead's tone was not "confrontational," AUSA Morehead's tone was "assertive."[51]  AUSA Morehead was assertive in telling Ms. Spradlin that Ruiz-Salazar could be charged with perjury if he testified, that Morehead was aware of his pending charges and which prosecutor was handling Ruiz-Salazar's case, and further that Morehead seeking ramifications against Ruiz-Salazar if he testified "was a strong possible outcome."[52]

While the Government maintains that AUSA Morehead simply discussed the possible consequences of perjury for Mr. Ruiz-Salazar,[53] importantly, Ms. Spradlin's testimony reveals that AUSA Morehead told her that Ruiz-Salazar could be charged with perjury if he testified and that Mr. Ruiz-Salazar could experience ramifications in his own case "if he testified" in this case.[54]  The implication was that the potential ramifications were tied to Ruiz-Salazar's act of testifying on behalf of Defendant, not an act of perjury.

Second, AUSA Morehead's statements went far beyond a simple perjury warning.  Both Defendant and Ruiz-Salazar testified that AUSA Morehead conveyed to Ms. Spradlin that if Ruiz-Salazar got in her way, she would get in his way in his case.[55]  This, coupled with Ms.

---

[50]*See Martinez*, 2016 WL 4399185, at *2 (quoting *Clark*, 284 F. App'x at 557).

[51]May 26, 2017 Hrg. Tr., Doc. 112 at 22.

[52]*Id.*

[53]Doc. 95 at 6.

[54]May 26, 2017 Hrg. Tr., Doc. 112 at 22; Def. Ex. 300.

[55]*Id.* at 8; Sept. 13, 2017 Hrg. Tr., Doc. 118 at 14.

Spradlin's testimony that AUSA Morehead told her she knew who was assigned to Ruiz-Salazar's case, evidences more than a straightforward perjury warning. This is strong evidence that AUSA Morehead communicated a veiled threat of prosecution or threat of creating further complications in his case if Ruiz-Salazar "got in her way" by testifying in Defendant's case.

Third, the evidence demonstrates that AUSA Morehead acted in bad faith.[56] Ms. Spradlin, Ruiz-Salazar, and Defendant all testified that AUSA Morehead conveyed that she would seek consequences in Ruiz-Salazar's case if he testified in this case.[57] While a limited warning of consequences for committing perjury is proper, a warning of consequences for simply taking the stand crosses the boundary line into improper witness interference.[58] A prosecutor's warning that she will personally interfere in a witness's pending case in another federal jurisdiction also crosses the bounds of fair play. This prosecutor should have had a heightened awareness of the bounds of fair play and the gravity of witness interference.[59] Moreover, although the Court concludes that the tone, content and import of AUSA Morehead's comments to Ms. Spradlin alone establish bad faith, AUSA Morehead's other conduct in this case also supports a finding that she acted in bad faith. On the morning of December 12, 2016, when jury selection was to commence, AUSA Morehead filed a sentencing information to double the mandatory minimum on Count 1 from 10 to 20 years; even viewing the evidence in the light

---

[56]*Martinez*, 2016 WL 4399185, at *2 (quoting *Clark*, 284 F. App'x at 557).

[57]May 26, 2017 Hrg. Tr., Doc. 112 at 8, 22; Sept. 13, 2017 Hrg. Tr., Doc. 118 at 14.

[58]*See United States v. Pablo*, 696 F.3d 1280, 1295–96 (10th Cir. 2012) (quoting *United States v. Serrano*, 406 F.3d 1208, 1214 (10th Cir. 2005)) ("Interference is substantial when the government actor *actively discourages* a witness from testifying through threats of prosecution, intimidation, or coercive badgering." (emphasis in original)).

[59]Indeed, in a highly publicized case, AUSA Morehead has been accused of improper witness interference in securing a wrongful conviction in *State v. McIntyre*, a case in which an innocent man was recently exonerated after serving 23 years for a murder he did not commit. *See State v. McIntyre*, Case No. 94CR1213, Order Releasing Defendant From Custody and Dismissal of 94CR1213 (Wyandotte Cty. Dist. Ct. Oct. 13, 2017); *see also* Max Londberg & Eric Adler, *Amid 'Free Lamonte' Chants, Hearing Begins in Case of KCK Man Imprisoned for 23 Years*, Kansas City Star, Oct. 12, 2017, http://www.kansascity.com/news/ local/article178461766.html.

most favorable to the Government, it is difficult to understand how someone who distributed the quantities of drugs at issue in this case should be subjected to a mandatory minimum of 20 years. Further, AUSA Morehead was seemingly more concerned about filing the sentencing enhancement, than she was concerned about the fact that she had disclosed exculpatory information to the defense just minutes before trial.   Indeed, she intimated to the Court that this late-disclosed information was irrelevant, rather than candidly advising the Court that this was Brady information.  Her lack of candor in admitting, much less in volunteering, that she had provided late-disclosure of Brady information is quite troubling.

Fourth, AUSA Morehead's comments to Ms. Spradlin were both unnecessarily strong and unjustified.  Several courts have explained that a defendant's Sixth Amendment rights are violated when a witness is discouraged from testifying by unnecessarily strong perjury warnings or perjury warnings made without any basis in the record to suggest that a witness may lie.[60] Even if AUSA Morehead's statements were an attempt to remind Ruiz-Salazar and his counsel of the consequences of perjury, it was an unnecessarily strong warning that implied consequences for simply testifying in this case.  Furthermore, the Government has pointed to no basis in the record to suggest that Ruiz-Salazar was preparing to lie on the stand.  Before AUSA Morehead's conversation with Ms. Spradlin, the Court explained that the Government could not ask Ruiz-Salazar about his case, other than to ask whether he was facing charges in the Western District of Missouri.[61]  Thus, the Government could not have had a reasonable concern that Ruiz-Salazar was about to make false statements regarding his own case, because he would not be making *any* statements about his case.  Additionally, while Ruiz-Salazar could be prosecuted

---

[60]*United States v. Smith*, 997 F.2d 674, 680 (10th Cir. 1993) (emphasis in original) (quoting *United States v. Simmons*, 670 F.2d 365, 368–69 (D.C. Cir. 1982)); *United States v. Juan*, 704 F.3d 1137, 1141 (9th Cir. 2013).

[61]Feb. 9, 2017 Trial Tr., Doc. 99 at 134–38.

in a separate case if he committed perjury, such perjury would not provide a basis for AUSA Morehead to "get in his way in his case."[62]  For these reasons, the Court finds that AUSA Morehead's warnings to Ruiz-Salazar's counsel were both unnecessarily strong and without justification.

Finally, the record reflects that Ruiz-Salazar was actually intimidated, and as a result did not testify in this case.  After his colloquy with the Court on February 9, 2017, Ruiz-Salazar was willing to testify.  But after Ms. Spradlin conveyed the message from AUSA Morehead, Ruiz-Salazar and Ms. Spradlin decided that "it wasn't like right at that moment."[63]  Ruiz-Salazar testified that he felt threatened that if he testified in this case, his own case would be impacted, even though the Court had previously explained that the Government could not ask questions about his case.[64]  Ruiz-Salazar further testified that aside from what Ms. Spradlin conveyed, there was nothing else that made him change his mind regarding testifying in this case.  Thus, the evidence suggests that but for the comments conveyed to Ruiz-Salazar from AUSA Morehead, Mr. Ruiz-Salazar would have testified in this case.

Ruiz-Salazar's testimony would have been both favorable and material to Defendant's case.  The testimony of Alejandro Ruiz was central to the Government's case as to Count 1.  Alejandro Ruiz testified that he had a business relationship with Defendant, selling him the Camaro, and further selling him methamphetamine in one-, two-, and four-ounce quantities.  But Ruiz-Salazar intended to testify that he, not his brother Alejandro Ruiz, sold Defendant the Camaro, and that he, not Alejandro Ruiz, had a friendship or relationship with Defendant.  In other words, Ruiz-Salazar's testimony rebutted Alejandro Ruiz's testimony that he knew

---

[62]*See* Feb. 10, 2017 Trial Tr., Doc. 87 at 9; Sept. 13, 2017 Trial Tr., Doc. 118 at 14.

[63]Sept. 13, 2017 Hrg. Tr., Doc. 118 at 15.

[64]*Id.*

Defendant and transacted business with Defendant.  Further, unlike Alejandro Ruiz, who was testifying in the capacity as a cooperator with the government, Ruiz-Salazar was not testifying for government favor.

The Government argues that although Ruiz-Salazar's testimony "may have impacted an extraneous fact pertaining to Alejandro Ruiz's offered testimony, there was other, independent, credible, and reliable evidence which the jury was presented which was sufficient to convict the defendant of each of the two offenses—testimony of Brittany Eastland, Tommy Cordell-Eastland, and Felix Leal."[65]  Thus, the Government argues that any interference with Ruiz-Salazar's decision to testify was harmless.[66]  Mr. and Ms. Eastland testified that they purchased or received drugs from Defendant mostly for personal use; and Felix Leal testified that he supplied methamphetamine to Defendant in quantities mostly for Defendant's "personal use."[67]  Alejandro Ruiz, however, testified that he sold Defendant methamphetamine in larger quantities intended for re-sale.  Certainly the jury could have discredited the testimony of Leal and the Eastlands about the quantities of drugs Defendant bought and sold, and given full credit to the testimony of Alejandro Ruiz.  Ultimately, it would have been up to the jury to weigh the divergent accounts of Leal, the Eastlands and Alejandro Ruiz; and had Ruiz-Salazar's testimony not been obstructed, the jury might have discredited the testimony of Alejandro Ruiz that he had any business relationship or transactions with Defendant.  There is no question that Ruiz-Salazar's proposed testimony, challenging that of Alejandro Ruiz, was thus favorable and material to Defendant.

---

[65]Doc. 120 at 6–7.

[66]*See United States v. Hasting*, 461 U.S. 499, 509 (1983) ("[T]he Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." (citations omitted)).

[67]Feb. 9, 2017 Trial Tr., Doc. 99 at 68, 94, 105.

AUSA Morehead's comments to Ms. Spradlin went far beyond a straightforward perjury warning. As Ruiz-Salazar and Defendant's testimony indicated, AUSA Morehead made a veiled threat of prosecution, suggesting that she would "get in [Mr. Ruiz-Salazar's] way in his case" if he testified in this case.[68] Ms. Spradlin further testified that AUSA Morehead indicated that Ruiz-Salazar would likely face consequences in his own case if he testified in this case.[69] To be sure, Ruiz-Salazar consulted with Ms. Spradlin before deciding not to testify. Courts have repeatedly stated that the coercive effect on a witness is diminished if the witness first consults with an independent attorney before deciding not to testify.[70] But the tempering effect that independent counsel typically has on coercive warnings was diminished in this case because Ms. Spradlin was apparently the messenger of AUSA Morehead's comments. As Ruiz-Salazar testified, there was nothing aside from what Ms. Spradlin conveyed that made him change his mind.[71] Ruiz-Salazar felt threatened, and decided not to testify.[72] Defendant was deprived of evidence that was material and favorable to his defense. Accordingly, the Court finds that AUSA Morehead violated Defendant's Sixth Amendment right to present a defense by substantially interfering with Ruiz-Salazar's decision to testify.

### B.      Remedy

Having found that AUSA Morehead substantially interfered with Defendant's right to present a defense, the Court turns to the proper remedy for this Sixth Amendment violation. "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies

---

[68]May 26, 2017 Hrg. Tr., Doc. 112 at 8; Sept. 13, 2017 Hrg. Tr., Doc. 118 at 14.

[69]May 26, 2017 Hrg. Tr., Doc. 112 at 8.

[70]*United States v. Serrano*, 406 F.3d 1208, 1216 (10th Cir. 2005) (citing *United States v. Smith*, 997 F.2d 674, 683 (10th Cir. 1993)).

[71]Sept. 13, 2017 Hrg. Tr., Doc. 118 at 16.

[72]*Id.* at 15.

should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."[73]  Under Fed. R. Crim. P. 33, upon a defendant's motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Dismissal of an indictment is an extraordinary, rarely invoked remedy.[74]  Thus, it is a proper remedy only where prosecutorial misconduct prejudices a defendant.[75]  "The remedy of dismissal may be used 'to insure proper standards of conduct by the prosecution.'"[76]

Defendant moved for a new trial in his original motion.[77]  After the September 13, 2017 hearing, which was the second evidentiary hearing, the Court directed the parties to submit additional briefing regarding the type of remedy to be imposed should the Court find that the Government violated Defendant's Sixth Amendment rights.  In his supplemental briefing, Defendant argues for either a new trial or dismissal on both Counts 1 and 2.[78]  The Government contends that neither dismissal nor a new trial on Counts 1 or 2 is appropriate, and that a remedy is appropriate for Government interference with a defense witness's decision to testify only when "there is some explanation of how their testimony would have been favorable and material to the defense."[79]  Defendant argues, and the Court has found, that Ruiz-Salazar would have provided favorable and material testimony on Count 1 by rebutting Alejandro Ruiz's testimony.

---

[73]*United States v. Morrison*, 449 U.S. 361, 364 (1981).

[74]*United States v. Pino*, 708 F.2d 523, 530 (1983).

[75]*See Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988) ("Our conclusion that a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant is supported by other decisions of this court.").

[76]*United States v. Turner*, 620 F. Supp. 525, 527 (D. Colo. 1985), aff'd, 799 F.2d 627 (10th Cir. 1986) (citing *Pino*, 708 F.3d at 530).

[77]*See* Doc. 92.

[78]Doc. 119 at 5–10.

[79]*United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982) (citations omitted).

Although Alejandro Ruiz's testimony did not directly relate to Count 2, Defendant argues that the Government's interference also affected his defense as to Count 2, because Defendant stated that he would not have taken the stand if Ruiz-Salazar had testified.[80]   Indeed, Defendant explained several times that he felt compelled to testify because Ruiz-Salazar refused to testify.[81]

As addressed above, the Government's interference prejudiced Defendant in depriving him of favorable and material testimony.   It further affected him in that Defendant felt compelled to testify, which also prejudiced him, at least in part.   Defendant was charged in Count 4 with being a felon in possession of a firearm.   Had Defendant not testified, the only evidence the jury would have heard about Defendant's criminal history was by way of stipulation,

> The parties stipulate that:
>
> (1) Prior to February 23, 2013, Gregory Orozco was convicted of felony crimes, that is, crimes punishable by imprisonment for a term exceeding one year under the laws of the respective jurisdictions.  As a result of said convictions, the defendant would have been prohibited under federal law from owning, possessing or purchasing a firearm and/or ammunition on February 23, 2013.[82]

The parties typically employ such an *Old Chief*[83] stipulation to the element of a prior felony conviction, without advising the jury of the nature of the prior felony, a fact that may have a prejudicial effect on a jury.   But here, once Defendant testified, he was examined about the nature of his prior felony convictions, which in this case, included convictions in 2007, 2008 and 2011 for drug possession, a 2006 conviction for forgery and aggravated assault and a 2011 conviction for fleeing and eluding.[84]

---

[80]Feb. 10, 2017 Trial Tr., Doc. 87 at 11.

[81]Feb. 27, 2017 Trial Tr., Doc. 87 at 11; May 26, 2017 Hrg. Tr., Doc. 112 at 8.

[82]Doc. 86 at 29 (Jury Instruction No. 25).

[83]*Old Chief v. United States*, 519 U.S. 172 (1997).

[84]Feb. 10, 2017 Trial Tr., Doc. 91 at 50–51.

The Government seems to suggest that there was no prejudice because defense counsel asked Defendant about these convictions in its direct examination.   But, as the Government is aware, it is common for any counsel direct examining its own witness to cover known impeachment material before opposing counsel cross examines the witness.  That is what happened here; and the Government unsurprisingly cross-examined the Defendant about these convictions in even more depth.  Had Defendant not felt compelled to testify, the jury would not have heard of the number or nature of these prior convictions, including prior drug possession convictions.  The Court thus concludes that AUSA Morehead's prosecutorial misconduct, in violating Defendant's Sixth Amendment right, prejudiced the Defendant.

Furthermore, the Court is not satisfied that a new trial would be an adequate remedy in this case.  Ruiz-Salazar testified at the September 13 hearing that he felt threatened that if he testified in this case, it would impact his own case.[85]  Ruiz-Salazar's case is ongoing,[86] and thus his concern likely has not abated.  Even if the Court was convinced that the Government would not further interfere with Defendant's right to present a defense in a subsequent trial, the effects of the Government's interference in Defendant's original trial will linger throughout this case. For example, even if Ruiz-Salazar was willing to testify in a new trial, his status has changed. He is now a convicted felon and would be subject to impeachment on that conviction.  For these reasons, a new trial would not provide an adequate remedy for the violation at issue here.

Because the Government's improper interference with Ruiz-Salazar's decision to testify prejudiced Defendant's case, and because a new trial would not remedy this violation, dismissal is the only proper remedy available in this case.  This remedy is "tailored to the injury suffered

---

[85]Sept. 13, 2017 Hrg. Tr., Doc. 118 at 15.

[86]*Id.* at 21 (Ms. Spradlin explaining that Ruiz-Salazar has entered a guilty plea and is awaiting sentencing).

from the constitutional violation."[87]  While the Court is certainly mindful that "[t]he reversal of a conviction entails substantial social costs,"[88] the Court is equally mindful that a constitutional violation that prejudices a defendant's case must be remedied.[89]  Here, dismissal is the only remedy that can "neutralize the taint" of the constitutional violation.[90]  Indeed, dismissal is also appropriate in this case, to insure proper standards of conduct by the prosecution.

Because Ruiz-Salazar's testimony related directly to the conviction on Count 1, the Court reverses Defendant's conviction on this Count and dismisses Count 1 with prejudice.   And, because Defendant felt compelled to testify, the Court concludes that the Government's conduct also prejudiced him with respect to Count 2.   Accordingly, the Court reverses Defendant's conviction on Count 2 and dismisses Count 2 with prejudice.

## VI.    Conclusion

In sum, AUSA Morehead's interference with Ruiz-Salazar's decision to testify was substantial and departed from proper standards of conduct by the prosecution.  AUSA Morehead threatened to get involved in Ruiz-Salazar's case in another jurisdiction if he testified in this case.  AUSA Morehead's comments went far beyond a straightforward perjury warning, and there was no indication that Ruiz-Salazar was prepared to falsely testify—or testify at all—about events related to his own case.  After AUSA Morehead's comments were conveyed to Ruiz-Salazar, he felt threatened and decided not to testify.  Ruiz-Salazar was prepared to provide testimony that was favorable and material to Defendant's case.  After Ruiz-Salazar made clear that he refused to testify, Defendant decided that he had to testify.  Thus, the Government's

---

[87]*United States v. Morrison*, 449 U.S. 361, 364 (1981).

[88]*Lafler v. Cooper*, 566 U.S. 156, 170 (2012) (citing *United States v. Mechanik*, 475 U.S. 166, 170 (1986)).

[89]*See Washington v. Texas*, 388 U.S. 14, 23 (1967) (holding that because defendant was denied Sixth Amendment right to compulsory process for obtaining witnesses whose testimony would have been "relevant and material to the defense," "[t]he judgment of conviction must be reversed.").

[90]*Lafler*, 566 U.S. at 170 (*Morrison*, 449 U.S. at 364).

interference prejudiced Defendant's case in multiple ways.  Under these circumstances, the only proper remedy for this constitutional violation is reversal of the counts of conviction and dismissal of the Indictment.  Because the Government's interference prejudiced Defendant as to both Counts 1 and 2, the Court reverses the judgments of conviction on Counts 1 and 2 and dismisses Counts 1 and 2 of the Superseding Indictment with prejudice.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for New Trial (Doc. 92) is **granted**.

**IT IS FURTHER ORDERED BY THE COURT** that the judgments of conviction on Counts 1 and 2 are **vacated**, and Counts 1 and 2 of the Superseding Indictment are hereby **dismissed with prejudice**.

Dated: December 5, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE